[No. 29064. *En Banc.* April 24, 1944.]

A. T. TRUDEAU, *Appellant,* v. PACIFIC STATES BOX & BASKET COMPANY et al., *Respondents.*[1]

[1]Reported in 148 P. (2d) 453.

*John T. Welsh* and *Theodore B. Bruener,* for appellant.

*Velikanje & Velikanje,* and *Fred M. Bond (Arthur A. Goldsmith,* of counsel), for respondents.

*The Attorney General, Hugh A. Dressel,* and *Joseph P. Lavin,* amici curiae.

BEALS, J.—Plaintiff in this action, A. T. Trudeau, a resident of Hoquiam, was for some years the owner of a truck, which, during the fruit season, he was accustomed to use in driving through the Yakima district, where he purchased fruit, which he sold in and around the Grays Harbor district. In 1939, he received from the department of public service a permit to operate as a common carrier, and a notice to this effect was properly displayed on his truck. In order that his trip from his home to Yakima might be profitable, he agreed with defendant Pacific States Box & Basket Company to haul from its mill in Raymond to defendant L. P. Michelsen, a fruit packer in Yakima, loads of box shooks to be made into fruit boxes, which had formerly been shipped to Michelsen by rail. It does not appear that there had been any regular trucking delivery service between Raymond and Yakima, and, when the question of freight charges was discussed between plaintiff and the box company, the latter stated that it had been paying the railroad for transporting the shooks at the rate of twenty cents per hundred pounds. This rate was satisfactory to plaintiff, and between June 17 and November 29, 1940, plaintiff carried shooks from Raymond to Mr. Michelsen at Yakima, at the rate of twenty cents per hundred pounds.

Prior to September, 1941, the state public service commission had promulgated no tariff governing charges for hauling freight by motor truck from Raymond to Yakima, the through rate according to effective railroad tariffs being the rate above stated, twenty cents per hundred pounds. In September, 1941, the public service commission estab-

lished a through rate between Raymond and Yakima, for motor-borne freight such as box shooks, in the sum of twenty-seven cents per hundred pounds. By combining the preexisting motor truck rates between Raymond and Tacoma, and Tacoma and Yakima, a rate of fifty-eight cents per hundred pounds was effective prior to September, 1941.

In September, 1941, plaintiff instituted this action against the defendants above named, alleging that he was a common carrier and subject to the rules, orders, regulations, and tariffs promulgated by the department of public service of Washington; that, between June and November, 1940, plaintiff, at defendants' request, had transported twenty-three shipments of box shooks, property of defendant box company, from Raymond to Yakima, where he had delivered the shipments to defendants Michelsen; that plaintiff had charged and collected from defendants, by way of freight, a sum less than the lawful rates prescribed by the department; and that the difference between the rate charged and collected by plaintiff and the legal rate amounted to $1,807.05, for which amount plaintiff demanded judgment.

Defendant box company answered, admitting the hauling of the freight, and alleging affirmatively that the shooks had been delivered to defendant Michelsen at the box company's plant at Raymond, to whom the answering defendant made a freight allowance of twenty cents per hundred pounds, and that the box company had not hired plaintiff or contracted with him or agreed to pay any transportation or other charges.

Defendant Michelsen answered, denying the material allegations of plaintiff's complaint, and pleading, as an affirmative defense, that the box company had included in the price of shooks the freight charges thereon, and that he had not, by any contract, assumed liability for freight or other charges.

Plaintiff having denied the affirmative allegations in the answers of the two defendants, the cause was tried to the court sitting without a jury, and resulted in the entry of

findings of fact, from which the court concluded that plaintiff's action should be dismissed, with prejudice. From a judgment dismissing the action, plaintiff has appealed.

Error is assigned upon the exclusion of certain testimony offered by plaintiff; upon the making of one finding of fact; and upon the entry of judgment dismissing the action.

The trial court found that appellant was, at all times material to the action, the holder of a common carrier permit, and was "a common carrier engaged in the transportation of box shooks for hire," and that he held himself out to the public, including respondents, as a common carrier, of all of which respondents were advised. The court found that appellant had carried box shooks and collected for carriage thereof, as alleged in his complaint; that there was no other rate established by the department of public service for the carriage of box shooks from Raymond to Yakima; and that, at all times material to the action, the combination rate for such carriage, according to the schedules established by the department, amounted to fifty-eight cents per hundred pounds.

The court further found that appellant never filed any tariff rate with the department; that he never circularized the trade, advertised in any paper, nor solicited any establishments for hauling for hire; that the railroad freight rate for hauling shooks from Raymond to Yakima was twenty cents per hundred pounds, and that the department of public service had never established any through rate for hauling shooks by auto truck between the points mentioned; that there was no discrimination or destructive competition existing for the hauling of box shooks from Raymond to Yakima; that, during the month of September, 1941, the department established a rate of twenty-seven cents per hundred pounds for hauling such merchandise from Raymond to Yakima; and that in April, 1942, the department established a rate of twenty-nine cents per hundred pounds for such carriage. Findings Nos. 13 and 14 read as follows:

"13. That between the 17th day of June, 1940, and the 29th day of November, 1940, and prior thereto, plaintiff was

engaged in the business of purchasing fruit in the Yakima valley and selling the same for his own account on the coast. That the only hauling done by plaintiff from west to east was the hauling of box tops and slats from the plant of the defendant, Pacific States Box and Basket Company at Raymond, Washington, to the defendant, Michelsen, at or in the vicinity of Yakima, Washington. Plaintiff only hauled fruit for sale on his own account from Yakima to the west.

"14. That the rate claimed of 58 cents per hundred pounds from Raymond to Yakima for carload lots, and 65 cents per hundred pounds for less than carload lots, is excessive, unreasonable, and is an absurdity."

The department, by a regulation, had provided that

"Except as otherwise provided in this tariff . . . (d) The lowest rate or combination of rates . . . over the route which a shipment moves shall be the legal rate . . . ;"

and for the purposes of this opinion and upon the record we assume that, pursuant to the department's rate schedules, the combination rate of fifty-eight cents per hundred pounds was the legal rate for carriage of box shooks by motor freight from Raymond to Yakima.

By Rem. Rev. Stat., Vol. 7A, § 6382-11 [P. C. § 234-13½k], the legislature conferred power upon the department of public service, and made it the duty of the department, to prescribe rules, rates, and regulations for common carriers. By §§ 6382-12 and 6382-13 [P. C. § 234-13½l and 234-13½m], similar powers were conferred upon the department in connection with the operation of contract carriers, and private and exempt carriers. By § 6382-19 [P. C. § 234-13½t], it is provided that no common or contract carrier may receive greater or less remuneration than that established by the department.

By chapter 166, p. 623, Laws of 1937, relating to transportation by motor vehicles, the legislature amended the preexisting law in certain particulars. By § 2 of this act, the legislature defined the different classes of carriers, as follows:

"(e) The term 'common carrier' means any person who undertakes to transport property for the general public by

motor vehicle for compensation, whether over regular or irregular routes, or regular or irregular schedules, including motor vehicle operations of other carriers by rail or water and of express or forwarding companies.

"(f) The term 'contract carrier' shall include all motor vehicle operators not included under the terms 'common carrier' and 'private carrier' as herein defined in paragraph (e) and paragraph (g), and further shall include any person who under special and individual contracts or agreements transports property by motor vehicle for compensation.

"(g) A 'private carrier' is a person who, in his own vehicle, transports only property owned or being bought or sold by him in good faith and only when such transportation is purely an incidental adjunct to some other established private business owned or operated by him in good faith."

Laws of 1935, chapter 184, p. 883, providing for the supervision and regulation of motor vehicle transportation, by § 2 defined terms used in the act, subdivisions (d) and (f) defining the terms "common carrier" and "contract carrier," respectively. These definitions were substantially reenacted by subdivisions (e) and (f), § 2, chapter 166, p. 624, Laws of 1937, *supra.*

Section 3, chapter 166, p. 625, Laws of 1937, reads as follows:

"Sec. 3. That chapter 184 of the Laws of 1935 be amended by adding a new section following section 2 thereof, to read as follows:

"Sec. 2-a. [Rem. Rev. Stat., Vol. 7A, § 6382-2a] Operators of motor vehicles excluded from the term 'private carrier,' other than 'common carriers' shall not be compelled to dedicate their property to the business of public transportation and subject themselves to all the duties and burdens imposed by the act upon 'common carriers,' but where they recover the cost of transportation through price differentials or in any other direct or indirect manner and such transportation cost recovery unreasonably endangers the stability of rates and the essential transportation service involving the movement of commodities over the same route or routes by other types of carriage, then such transportation costs, attempted to be recovered, shall not be less than the rate, fare or charge regularly established by the department for such transportation service if given by other

types of carriers, it being the intention of the legislature to foster a stable rate structure free of discriminations for the shippers of the State of Washington."

By the act of 1937, the definition of the term "private carrier" was materially changed from the definition of that term as contained in the act of 1935 (§ 2, subdivision (h)).

Section 3 of the act of 1937, *supra,* was an addition to the statutes covering carriers, and was enacted together with the definitions of carriers contained in the act of 1937. The section was evidently added by the legislature in order to cover some special situation not covered by previous legislative enactments. Apparently this section has never been cited in any of our decisions.

The first question to be considered is the class of carriers to which appellant belonged. As above stated, the trial court found that appellant was a common carrier. There is no dispute in the evidence concerning what appellant actually did in the course of his business as operator of his motor truck. In making the finding referred to, the trial court did not weigh contradictory evidence, but entered the finding upon a record which contained no disputed testimony. Respondent contends that the court erred in making this finding, and that upon the evidence the court should have found that appellant was a contract carrier, in so far as the facts of this case are concerned, and not a common carrier.

■ Under the circumstances shown, this court is nowise bound by the finding referred to. In the case of *Burnham v. Rowley,* 111 Wash. 656, 191 Pac. 811, the court said:

"This is not a case where the oral testimony was in conflict upon any material matter and the trial court, after hearing the testimony, had made a finding thereon. It is a question of the proper inference to be drawn from the undisputed evidence."

The cases of *Pacific Coast Cement Co. v. Metropolitan Cas. Ins. Co.,* 173 Wash. 534, 23 P. (2d) 890, and *Brotherton v. Day & Night Fuel Co.,* 192 Wash. 362, 73 P. (2d) 788, are to the same effect.

The court's finding that appellant was a common carrier amounts to no more than a conclusion from the evidence.

It is argued by *amici curiae* that this court may not consider the correctness of the finding, no cross-appeal having been taken from the judgment by respondents. This argument is not well taken. No interlocutory order was based upon the holding of the trial court that appellant was a common carrier. It is not necessary that an exception to a finding of fact be preserved. The entire record is before us, and this court may review the finding entered in the light of all the evidence. Under these circumstances, on appellant's appeal respondent may urge that the finding entered by the trial court was erroneous, and that question is open for argument by the parties and determination by this court. Rem. Rev. Stat., § 1736 [P. C. § 7321]; *Huntington v. Love,* 56 Wash. 674, 106 Pac. 185; *In re Ney's Estate,* 183 Wash. 503, 48 P. (2d) 924.

It is, of course, admitted that appellant had applied to the department of public service for a permit to operate as a common carrier; that he received such a permit; and that a proper notice thereof was carried upon his truck. This court, however, has several times held that the question of whether or not a person was acting as a common carrier in connection with a certain state of facts is to be determined by what he did, and that the fact that he had authority to act as a common carrier was not determinative of the question.

In connection with the facts disclosed by the record in the case at bar, upon which appellant seeks to recover judgment, the only evidence tending to show that appellant was acting as a common carrier is the testimony that he had a permit to act as such, and that he held himself out to the public generally as a common carrier. It is, however, clear from appellant's own testimony that, during the period of time material to this case, appellant carried freight for no one other than respondents, and that during this time he neither advertised for nor solicited business from anyone else. It is also apparent that he was unfa-

miliar with the rates charged by common carriers for this type of service, and relied solely upon what respondent box company told him was the rate for carriage by rail. It is also clear that during this time appellant's hauling for respondents was merely incidental to his own personal business of buying, transporting, and selling fruit.

In the early case of *Cushing v. White,* 101 Wash. 172, 172 Pac. 229, after a discussion of many authorities, this court said:

"A common carrier is one whose occupation is the transportation of persons or things from place to place for hire or reward, and who holds himself out to the world as ready and willing to serve the public indifferently in the particular line or department in which he is engaged; the true test being whether the given undertaking is a part of the business engaged in by the carrier which he has held out to the general public as his occupation, rather than the quantity or extent of the business actually transacted, or the number and character of the conveyances used in the employment. On the other hand, if the undertaking be a single transaction, not a part of the general business or occupation engaged in, as advertised and held out to the general public, then the individual or company furnishing such service is a private and not a common carrier. In either case the question must be determined by the character of the business actually carried on by the carrier and not by any secret intention or mental reservation it may entertain or assert when charged with the duties and obligations which the law imposes."

The decision of the supreme court of the United States, written by Mr. Justice Holmes, in the case of *Terminal Taxicab Co. v. Kutz,* 241 U. S. 252, 60 L. Ed. 984, 36 S. Ct. 583, has frequently been cited. In the course of the opinion, the court said:

"The rest of the plaintiff's business, amounting to four-tenths, consists mainly in furnishing automobiles from its central garage on orders, generally by telephone. It asserts the right to refuse the service and no doubt would do so if the pay was uncertain, but it advertises extensively and we must assume, generally accepts any seemingly solvent customer. Still, the bargains are individual, and however much they may tend towards uniformity in price probably

have not quite the mechanical fixity of charges that attends the use of taxicabs from the Station and hotels. There is no contract with a third person to serve the public generally. . . . Although I have not been able to free my mind from doubt the Court is of opinion that this part of the business is not to be regarded as a public utility. It is true that all business, and for the matter of that, every life in all its details, has a public aspect, some bearing upon the welfare of the community in which it is passed. But however it may have been in earlier days as to the common callings, it is assumed in our time that an invitation to the public to buy does not necessarily entail an obligation to sell. It is assumed that an ordinary shop keeper may refuse his wares arbitrarily to a customer whom he dislikes, and although that consideration is not conclusive, . . . it is assumed that such a calling is not public as the word is used."

This court, in the case of *Big Bend Auto Freight v. Ogers,* 148 Wash. 521, 269 Pac. 802, said:

"The first question to be determined is whether or not respondent, under the facts in this case, is a common carrier. What constitutes a common carrier is a question of law, and it is a question of fact whether one charged as a common carrier is within that definition. 40 C. J. 39. It is also well established that a private carrier can not, by legislative command, be converted into a common carrier consistent with the due process clause of the Fourteenth Amendment to the Federal Constitution."

In the recent case of *Miles v. Enumclaw Co-operative Creamery Corp.,* 12 Wn. (2d) 377, 121 P. (2d) 945, this court considered questions very similar to those here presented. In the course of the opinion, we said:

"The basic question for determination is whether respondent was a common carrier. If he was such, he was bound to charge and collect the rate fixed by the order of the department of public service, M. V. No. 28132. [Citing cases.] The respondent seems to contend that he became a common carrier *ipso facto* when he was granted a permit as such and complied with the law and the regulations pertaining to common carriers. With this contention, we cannot agree.

"The state, under its regulatory powers, cannot, by legislative fiat or through its administrative officers, convert a

private or contract carrier into a common carrier. [Citing cases.] While what constitutes a common carrier is a question of law, the status of a carrier, as such, must be determined from his method of operation."

It was held that the plaintiff-respondent, in connection with the transaction which was the subject matter of the action, was not a common carrier, and a judgment in his favor was reversed.

In the early case of *State ex rel. Silver Lake etc. Co. v. Public Service Commission,* 117 Wash. 453, 201 Pac. 765, 203 Pac. 3, this court reversed a judgment of the superior court affirming an order of the then public service commission declaring the relator a common carrier, and requiring it to operate its railway as such. This court held that, notwithstanding the fact that the railway was operated under a charter vesting the corporation with the broad powers of a common carrier railway company, the commission had erred in entering an order declaring relator to be a common carrier, the status of the corporation to be determined by what it had actually done, and not by its charter powers.

Appellant calls attention to the fact that some of our early cases were decided under different statutes. This is true, but, in so far as the question here presented is concerned, that fact is immaterial.

The cases of *Ace-High Dresses v. J. C. Trucking Co.,* 122 Conn. 578, 191 Atl. 536, 112 A. L. R. 86; *Smitherman & McDonald v. Mansfield Hardwood Lbr. Co.,* 6 F. (2d) 29; *Senters v. Ratliff's Adm'r,* 278 Ky. 290, 128 S. W. (2d) 724; *Presson v. Vail Cooperage Co.,* 155 Ark. 424, 245 S. W. 14; *Osage Tie & Timber Co. v. Gorg-Murphy Timber & Grain Co.,* 191 S. W. (Mo. App.) 1026, are of interest in this connection.

It is the rule in this state, the rule being amply supported by our decisions and by authorities from other jurisdictions, that the granting of a permit to operate as a common carrier by the department of public service authorizes the holder of the permit to engage in business as a common carrier, but does not of itself in all cases and under all cir-

cumstances make him a common carrier, either in fact or in law.

In the recent case of *Larson v. Aetna Life Ins. Co.*, 19 Wn. (2d) 601, 143 P. (2d) 850, we said:

"Now, in these operations, may either Bellows on the one hand or Barton and Sherman on the other be said to be engaged in the business of a common carrier. Whether one is engaged in such business is, of course, to be determined by what he does,"

citing *Terminal Taxicab Co. v. Kutz, supra,* and other authorities.

Consideration of the record convinces us that, in his dealings with respondents, appellant was not acting as a common carrier, but occupied the relationship of a contract carrier. The court's finding that in transporting the box shooks appellant was acting as a common carrier, is not supported by the evidence.

Appellant argues that, even if it be held that in his relations with respondents he was acting as a contract carrier, the court nevertheless erred in not rendering judgment in his favor, as the schedule of rates fixed by the department for carrying shooks was the same for both common and contract carriers.

It is true that the only rate schedule covering the matter of transportation of the box shooks from Raymond to Yakima was the combination rate from Raymond to Tacoma and from Tacoma to Yakima, amounting to fifty-eight cents per hundred pounds. This rate is manifestly out of line, the trial court having found it to be excessive, unreasonable, and absurd. As above stated, the rate by rail was twenty cents per hundred pounds. As first fixed by the department for motor trucks, after the hauling in the case at bar had been accomplished, the rate was twenty-seven cents per hundred pounds, raised shortly thereafter to twenty-nine cents, just one-half the combination rate sought to be enforced by appellant. A rate for such freight to be hauled by truck might well be higher than the rate by rail, as the truck can load the freight at the source and

unload it at its destination. This, however, nowise compensates for the excessive combination rate.

From the record it is evident that appellant was glad to meet the rail rate and procure the business on those terms, as it afforded him compensation for the trip to Yakima, where he purchased his fruit. Evidently appellant was entirely satisfied with the arrangement until he was directed by the department to collect the higher rate. The fixing of rates to be charged by carriers is a legislative function, which may be delegated in accordance with the discretion of the legislature. *Great Northern R. Co. v. Department of Public Works*, 161 Wash. 29, 296 Pac. 142. The person aggrieved by an order of the department may review the order, as provided by statute (Rem. Rev. Stat. (Sup.), § 10428 [P. C. § 5613]), but if not reviewed the order of the department stands (Rem. Rev. Stat., § 10448 [P. C. § 5626]).

In the case at bar, no party sought relief against the department's rate schedules, and the rates must stand, unless inapplicable for some reason other than that they are unreasonable.

Respondents suggest that the sections last referred to do not apply to persons within the purview of the motor vehicle act, but Rem. Rev. Stat., Vol. 7A, § 6382-31a [P. C. § 234-13¾ ff], makes the provision so applicable.

The case, then, turns upon the question of whether appellant, as a contract carrier, was required to charge the combination freight rate of fifty-eight cents per hundred pounds, above referred to, and may now recover from respondents judgment for the difference between twenty cents per hundred pounds and the higher rate.

It is evident from the record and from geographical facts, of which the court takes judicial notice, that there would be comparatively little freight shipped from Raymond to Yakima. The railroad was available for transportation of freight, and of course was able to answer all calls for such transportation.

Referring now to Rem. Rev. Stat., Vol. 7A, § 6382-2a [P. C. § 234-13½bb], *supra,* we find that the same establishes

a principle which is controlling in the case at bar. Appellant argues that this section was intended to apply to mercantile and other businesses making deliveries in their own trucks to customers at different points, and who are reimbursed for the delivery service by an additional charge included in the cost of the merchandise, or in some other manner. The suggested situation is, however, within the definition of private carrier, as defined in chapter 166, Laws of 1937, *supra*. The same act, in defining contract carrier, *supra*, provides that that term "shall include all motor vehicle operators not included under the terms common carrier and private carrier," as defined by the act. Section 6382-2a expressly excludes from its scope private carriers and common carriers. Beyond question, then, it was intended to apply to contract carriers. It must be assumed that the section, being entirely new, was incorporated within the act of 1937 for some purpose, and to meet certain situations which the legislature believed were not appropriately controlled by previous statutes. It clearly declares a legislative purpose, as stated in the last three lines of the section:

" . . . it being the intention of the legislature to foster a stable rate structure free of discriminations for the shippers of the State of Washington."

Manifestly, the section exempts a certain type of carrier (which can only be a contract carrier, see definition of "contract carrier," *supra*) from the complete operation of the act, providing that this type of carrier shall not be required to dedicate his property to the business of public transportation, and subject himself to all the duties and burdens imposed by the act upon common carriers.

This portion of the section relieves the class of carriers referred to therein from some of the obligations assumed by common carriers. The section then continues by providing that, if the charge sought to be recovered by the carrier unreasonably endangers the stability of rates and the transportation service over the same route maintained by other types of carriage, the transportation costs which

may be collected shall not be less than the rate established by the department for such transportation "if given by other types of carriers." In the case at bar, the only direct service available from Raymond to Yakima was by rail, and the charge made by appellant for carrying the box shooks equaled the tariff for that service.

While this portion of the section apparently has the primary purpose of preventing a cutting of rates by a contract carrier who is in direct competition with other carriers, the legislative intent "to foster a stable rate structure free of discriminations for the shippers of the State of Washington" is clearly expressed, and applies with equal force to out-of-line charges, whether too high or too low. That the rate sought to be enforced, as applied to the facts of this case, is unreasonable and discriminatory, cannot be denied. That is demonstrated by the twenty-nine cent rate later fixed by the department.

It may appropriately be noted that appellant's operations were extremely informal. He complied neither with the departmental rules and regulations relating to common carriers nor those concerning contract carriers.

We have held that appellant, in the operations which are the subject matter of this action, was a contract carrier. Rem. Rev. Stat., Vol. 7A, § 6382-19 [P. C. § 234-13½t], provides, *inter alia*:

"No 'common carrier' or 'contract carrier' shall collect or receive a greater, less or different remuneration for the transportation of property or for any service in connection therewith than the rates and charges which shall have been legally established and filed with the department, or as are specified in the contract or contracts filed, as the case may be. . . ."

There is no suggestion here of any secret rebate or unfair practice whatsoever.

It was appellant's duty, either as a common carrier or a contract carrier, to advise himself concerning the established rates. He might have availed himself of the privilege of filing with the department a rate pursuant to which he would carry the box shooks from Raymond to Yakima.

This he did not do. Pursuant to the section last quoted, he might have filed a contract specifying rates, but this he neglected. It was appellant's duty to advise himself of the established rates, and inform his patrons. While on the other hand, respondents are presumed to know that rates for carriage of freight have been established, a greater burden rested upon appellant to advise himself and his patrons as to the rates which he should charge.

It is true that appellant testified that he considered himself a common carrier, but he nowise complied with the law governing such operations. He testified:

"Q. When you picked up shipments from Pacific States Box and Basket Company for delivery to Michelsen, did you give any bill of lading to any representative of the Pacific States Box & Basket Co.? A. No I didn't. Q. You never gave any bill of lading during the year 1940? A. Not that I can remember of. Q. Did you ever file a tariff with the public service commission during the year 1940? A. No sir."

There is not the least evidence of bad faith on the part of respondents. They were willing to pay appellant the same rate they had been paying the railroad for transporting their freight, and appellant was glad to perform the service for this consideration. Appellant was extremely negligent in failing to observe the rules and regulations of the department, and to acquaint himself with the established tariffs. To allow appellant to recover the judgment he seeks against respondents would permit him to take an unconscionable advantage of his own wrong, and would certainly be far from fostering "a stable rate structure free of discriminations" for at least one of the shippers of the state of Washington. Conceding that the conduct of the parties to such a transaction is nowise a controlling consideration in such a case as this, which must be decided upon the statute law, all relevant facts may be considered.

Appellant further assigns as error the refusal of the trial court to admit in evidence certain notices and orders of the department of public service relating to Trudeau's status as a carrier and suspending his common carrier's

578

permit until the bringing of this action. These purported orders and findings were not certified. The objection to certification was not waived, and, while the offer was made with the privilege of substituting certified copies, the further objection of irrelevancy seems well taken. These orders appear to have been entirely *ex parte*. There was no error in refusing to admit such matters in evidence.

It has been suggested that the so-called departmental rate is not binding in any event. In view of our conclusion on other phases of the case, it is unnecessary to pass upon this question, and we express no opinion thereon.

■ We are not in accord with the trial court in the reasons assigned for entering the judgment dismissing appellant's action, but the result reached was correct, and the judgment appealed from is accordingly affirmed.

SIMPSON, C. J., MILLARD, BLAKE, ROBINSON, MALLERY, and GRADY, JJ., concur.

STEINERT, J. (concurring in the result)—The majority opinion reaches its conclusion through a contemporaneous construction of Rem. Rev. Stat., Vol. 7A, § 6382-2a. That construction is founded upon (1) a judicial discovery in the statute of a legislative intent to "foster a stable rate structure free of discrimination for the shippers of the state of Washington," and (2) a judicial projection of that intent into a general application of the section to all "out-of-line charges, whether too high or too low."

I am not in accord with that construction of the statute. It seems to me that the legislature enacted § 6382-2a for the specific purpose of taking contract carriers out of that category which otherwise would compel them "to dedicate their property to the business of transportation and [thereby] subject themselves to all the duties and burdens imposed by the act upon 'common carriers'," but *at the same time* to make certain that such exemptions or privileges did not permit contract carriers to *undercut* rates, fares, or charges regularly established by the department for such transportation services rendered by other types of

carriers. In short, the legislative purpose in this latter respect was, by the prevention of undercutting, to preserve the integrity of rates regularly established by the department for carriers other than contract carriers. Obviously, such established rates for common carriers would not be jeopardized by higher rates charged by contract carriers. The reasoning of the majority opinion would compel a uniform rate to be charged by both common carriers and contract carriers, which is contrary not only to the provisions of § 6382-19, but also to the recognized settled departmental practice with reference to differing types of transportation service.

In passing, I will also say that in my opinion the fact that the department in 1941 (which was after the rendition of the services here involved) established a motorborne through rate at less than the combined rate of fifty-eight cents per hundred pounds, has nothing whatever to do with this case. It is neither a fact, nor evidence of any fact, involved in the situation presented here.

My concurrence in the result obtained in the majority opinion rests upon a ground which, though not specifically adopted by the majority, is nevertheless inherent, I think, in its opinion. It is clear, not only from the majority opinion, but from the entire record as well, that this case involves no element of fraud, secret rebates, bad faith, or unfair practice. The respondents previously had been shipping their box shooks from Raymond to Yakima by rail, upon the established common carrier rate of twenty cents per hundred pounds. Appellant solicited the business of the respondents and obtained it upon the basis of that rate. He was content to haul the freight upon that consideration, and it is clear from the record that it was solely for his benefit that the contract was made. Respondents gained nothing by way of a saving in transportation charges, for they had access to the railroad upon an established rate of twenty cents per hundred pounds. Quite likely respondents were willing to patronize appellant simply because he was a resident of the vicinity, and they

would thus be supporting a home industry. Concededly, both parties were then acting in entire good faith, upon the assumption that the charge was legally proper, and without any thought whatever of violating or evading any law of the state of Washington.

Now, after the service has been rendered, after the agreed charge has been paid, appellant commences this action (at the instance of the public service department) to recover a charge almost three times as great as the agreed rate, which formerly was satisfactory to him. To permit him to recover, under the admitted facts in this case, would, in my opinion, be unconscionable and outrageously wrong. Its only possible justification is an alleged public policy protective of the public welfare in the matter of the stability of transportation rates.

The meaning of the term "public policy" is at best vague and variable, and there is no fixed rule by which to determine what it is or what contracts are repugnant to it. A principle of public policy at one time or under one set of circumstances may at another time or under different circumstances be the reverse. In fact, the question of public policy is as broad and, at the same time, as indefinite as the question of fraud, and the propriety of its application in a particular instance' is addressed to the good common sense of the court. It certainly is not the policy of the law or of the public to encourage an unconscionable recovery upon a contract made and fully executed in good faith, nor will such recovery tend to protect the public welfare, sound morality, or civic honesty. Least of all will it tend to promote respect for the law.

I think a judgment of affirmance in this case should rest upon a holding that under the admitted facts the appellant is led to seek an unconscionable return, contrary to the terms of his contract and subversive of the fundamental principle of common honesty in business transactions.

I recognize the fact that the appellant is not altogether a willing plaintiff in this action, and my conclusions are ad-

dressed more specifically to the results of a permissible recovery than to any motives which might have prompted or compelled the appellant to institute the suit.

I concur in the result.

JEFFERS, J. (dissenting)—I am unable to agree with the majority opinion. The trial court found that appellant Trudeau was a common carrier, engaged in the transportation of box shooks for hire, and that he held himself out to the public, including respondents Pacific States Box & Basket Company (hereinafter referred to as Pacific Box Co.) and L. P. Michelsen, as a common carrier; that respondents knew appellant was a common carrier operating under a common carrier permit; that appellant was subject to the rules, orders, regulations, and tariffs issued by the department of public service; that, between June 17, 1940, and November 29, 1940, appellant, at the instance and request of respondents, transported twenty-three shipments of box shooks between Raymond, Washington, and Yakima, Washington, as a common carrier, under common carrier permit No. 6870.

The court further found that there was no through rate established by the department for the shipment of box shooks from Raymond to Yakima, but that at all times material to this action it was possible to ascertain the combination rate for the transportation of box shooks from Raymond to Yakima, which combination rate had been duly made and established by the department; that the combination rate consisted of the rates from Raymond to Tacoma, and from Tacoma to Yakima, and amounted to fifty-eight cents per hundred pounds.

The court further found that the rail rate on box shooks from Raymond to Yakima was twenty cents per hundred pounds in 1940, and that all parties knew what the through railroad rate was; that there was no discrimination or destructive competition existing for the hauling of the products involved in this action from Raymond to Yakima; that, during the month of September, 1941, the department established a rate of twenty-seven cents per hundred

pounds for the transportation of articles by motor truck between Raymond and Yakima, similar to those involved in this action, and in April, 1942, the department established a rate of twenty-nine cents.

The trial court further found that the only hauling done by appellant from west to east during 1940 was the hauling of box tops and slats from the plant of Pacific Box Co. at Raymond to respondent Michelsen at or near Yakima; that, between June 17, 1940, and November 29, 1940, appellant was engaged in the business of purchasing fruit in the Yakima valley and selling the same for his own account on the coast.

In addition to the foregoing findings of fact, the court found that the rate claimed of fifty-eight cents per hundred pounds from Raymond to Yakima is excessive, unreasonable, and is an absurdity. Based upon the findings of fact, the court concluded that appellant's complaint should be dismissed.

The majority opinion admits that the judgment of the trial court cannot be sustained upon the theory that the combined rate of fifty-eight cents established by the department was unreasonable, as the question of the reasonableness of this rate is one which must, in the first instance, be determined by the department, under the authority vested in it by the statutes. The opinion, however, seeks to apply the rule that, if the judgment of the lower court can be sustained upon any legal ground, the judgment should be affirmed. The opinion then concludes that the judgment can be sustained under the provisions of Rem. Rev. Stat., Vol. 7A, § 6382-2a. In reaching the conclusion that the section last referred to is applicable herein, the opinion holds that appellant was not a common carrier, but was in fact a contract carrier, and that the section referred to contract carriers.

Respondents introduced no testimony in this case.

It is not disputed that at all times herein material appellant held common carrier permit No. 6870. Appellant testified that he had upon his truck or trucks the identification plates required by Rem. Rev. Stat., Vol. 7A, § 6382-27

[P. C. § 234-13¾b], which plates indicate whether the operator holds a common carrier or contract carrier permit. Counsel for respondents, at page 63 of the statement of facts, stated: "We knew that this man had or claimed to have a common carrier permit."

Appellant testified that he was a truck hauler for the general public, and hauled any place in the state of Washington; that he had never refused to haul for hire; that he held a common carrier permit; that he actually collected twenty cents per hundred pounds for the hauling from Raymond to Yakima. He further testified that prior to 1940 he had been purchasing fruit in the Yakima valley, and hauling it to the harbor, where he sold it, and this he continued to do in 1940, after obtaining his common carrier permit; that in 1940 he only hauled from west of the Cascades, east, for respondent Pacific Box Co. It further appears from his testimony that he did not seek other business, as he was kept busy hauling for respondent; that he filed no tariffs with the department in 1940, but that tariffs were sent to him by the department; that he was unable to figure out the tariff from Raymond to Yakima. When appellant was asked how he knew what to charge for his hauling, he answered: "Mr. Richardson told us what the rate was."

Ellery Grandstrand, testifying for appellant, stated that he was interested in Mr. Trudeau's trucking business, and was familiar with these shipments. Among other questions, the witness was asked if he knew the tariff rate on box shooks between Raymond and Yakima in 1940, to which he replied:

"No, the tariff rate becomes kind of complicated to work out, we tried to figure a rate out at the time, and we could not arrive at one. When we arrived at the mill, we figured Mr. Richardson shipped these shooks and would know what the rate was and we accepted his rate as correct and made no further check on it."

The rate named by Mr. Richardson, and which was subsequently paid by respondents and collected by appellant, was the rail rate from Raymond to Yakima.

Appellant further testified that on or about June 12, 1941, he was ordered by the department to collect the difference between the rate charged and that established by the department and that his permit was revoked until this action was commenced.

While I appreciate that statements will be found in our decisions, beginning at least as early as *Cushing v. White,* 101 Wash. 172, 172 Pac. 229, to the effect that the status of a carrier, as such, is a factual question to be determined from his method of operation, I am satisfied that since the enactment of Laws of 1935, chapter 184, p. 890, § 15 (see present law, Rem. Rev. Stat., Vol. 7A, § 6382-15 [P. C. § 234-13½p]), that determination is one which must be made in the first instance by the department and not by the courts. I quote from the section last above referred to:

"Whether or not any motor vehicle is being operated upon the highways of this state within its proper classification, as defined by section 2 of this act [§ 2 defines "common carrier," "contract carrier," "private carrier," and "motor carrier"] shall be a question of fact to be determined by the department."

However, I am satisfied that in the instant case, assuming that the court had jurisdiction, the court did not err in holding that appellant was in fact a common carrier.

The majority opinion makes a point of the fact that, during the time herein mentioned, appellant neither advertised for nor solicited business from parties other than respondents. It should be kept in mind that under Rem. Rev. Stat., Vol. 7A, § 6382-11, the department is

" . . . vested with power and authority, and it is hereby made its duty, to supervise and regulate every 'common carrier' in this state; to make, fix, alter and amend, just, fair, reasonable, minimum, maximum, or minimum and maximum, rates, charges, classifications, rules and regulations of all 'common carriers; . . . '"

Under Rem. Rev. Stat., Vol. 7A, § 6382-12 [P. C. § 234-13½1], the department is vested with power,

" . . . and it is hereby made its duty, to supervise and regulate every 'contract carrier' in this state; to fix, alter and amend, just, fair and reasonable classifications, rules and regulations and minimum rates and charges of each such 'contract carrier; . . .' "

The only identification that the statute requires of the operator is that provided for in Rem. Rev. Stat., Vol. 7A, § 6382-27, and is as follows:

"It shall be unlawful for any 'common carrier,' or 'contract carrier' to operate any motor vehicle within this state unless there shall be displayed and firmly fixed upon the front and rear of such vehicle an identification plate to be furnished by the department. Such plates shall be different in design for the different classes of carriers, shall bear the number given to the vehicle by the department, and such other marks of identification as may be required, and, subject to the qualification hereinafter contained, shall be in addition to the regular license plates required by law."

Not only is it uncontroverted that appellant's vehicle had on it the plates showing the operator had a common carrier permit, but respondents admit that they knew he had such a permit.

I am of the opinion that when it appears, as it does in this case, that an operator holds a common carrier permit, and that such fact is shown by appropriate plates upon the operator's vehicle or vehicles, and where it further appears that the shipper knew that the carrier held a common carrier permit, and it further appears that the carrier had not refused to transport goods for any person requiring such transportation, such operator is clearly within the definition of a common carrier, as defined by Rem. Rev. Stat., Vol. 7A, § 6382-2. In other words, such facts constitute a sufficient advertisement to the public that the operator is a common carrier, and a shipper who procures such a carrier to transport goods for him is required to pay the rate established by the department for such hauling, regardless of any rate agreed upon between the carrier and the shipper. As long as the established rate stands, the carrier must charge and collect, and the shipper must pay,

such rate. It is admitted here that there was an established rate of fifty-eight cents per hundred pounds for the transportation of box shooks between Raymond and Yakima.

In *Miles v. Enumclaw Co-operative Creamery Corp.*, 12 Wn. (2d) 377, 121 P. (2d) 945, we stated:

"The basic question for determination is whether respondent was a common carrier. If he was such, he was bound to charge and collect the rate fixed by the order of the department of public service, M. V. No. 28132. [Citing cases.]"

It may be admitted that the rate of fifty-eight cents does seem excessive, when compared with the rail rate of twenty cents, but nevertheless this does not permit a common carrier and a shipper to agree upon some rate other than that established by the department. If the rate as established is excessive, there is a method prescribed for having it adjusted.

This court was not influenced by the great difference between the rate agreed upon between the Sound Ferry Lines and Wolverton Auto Bus Co. and the amount fixed by the tariff filed with the department, in the case of *Robinson v. Wolverton Auto Bus Co.*, 163 Wash. 160, 300 Pac. 533, wherein we allowed recovery on the basis of the established rate. In the cited case, we stated:

"The tariff of ten dollars per stage was fixed by a lawful tariff filed by respondent with the department of public works, and, with the other rates fixed by the tariff, was valid and effective until modified. The carrier and its patron cannot evade the collection and payment of such lawful rates by any agreement between themselves. The rate fixed by the lawful tariff on file must be charged and paid. . . . If the rate fixed by the tariff on file was unreasonable, the same was subject to attack and modification. As long as such rate stood, however, it must be held operative."

The majority opinion cites authority from other jurisdictions, as well as cases from this state, to support the conclusion reached, that whether or not an operator is a

common carrier is a question of fact to be determined from the method of operation. Without discussing the cases, it may be admitted that they contain statements of the above rule, but, in my opinion, the cases are factually so different from the instant case as not to be controlling.

Having concluded that appellant was in fact a common carrier, it follows, of course, that Rem. Rev. Stat., Vol. 7A, § 6382-2a, cited and relied upon in the majority opinion, has no application herein.

But assuming, for the sake of argument, that appellant was only a contract carrier, and that the section last above referred to has some application, I cannot agree with the construction placed upon it by the majority opinion.

I frankly admit that it has been difficult, if not impossible, for me to determine what the legislature had in mind in passing § 6382-2a, *supra*. In view of the statutes vesting in the department authority to supervise and regulate both common and contract carriers, and to fix rates, and in view of the statute which prohibits either a common or contract carrier from collecting or receiving any rate, charge, or remuneration different from that established by the department, it is impossible for me to believe that it was intended by § 6382-2a to permit a contract carrier and a shipper to agree upon a rate to be charged for transportation, without at least having first filed such proposed rate and obtained the approval of the department.

There is no question raised as to the amount appellant is entitled to recover in this case, if he is entitled to recover at all.

For the reasons assigned, I am of the opinion the judgment of the trial court should be reversed, with instructions to enter judgment for appellant as prayed for in his complaint.